[Nos. A114805, A115841, A115950. First Dist., Div. Five. Jan. 31, 2008.]

NORTHWEST ENERGETIC SERVICES, LLC, Plaintiff and Respondent, v. CALIFORNIA FRANCHISE TAX BOARD, Defendant and Appellant.

844

## COUNSEL

Edmund G. Brown, Jr., Attorney General, Randall P. Borcherding, Jeffrey Rich and Marguerite C. Stricklin, Deputy Attorneys General, for Defendant and Appellant.

Silverstein & Pomerantz, Amy L. Silverstein and Edwin P. Antolin for Plaintiff and Respondent.

## OPINION

**NEEDHAM, J.**—In these consolidated appeals, the California Franchise Tax Board (FTB) challenges a judgment awarding respondent Northwest

Energetic Services, LLC (Northwest) a refund of amounts paid under Revenue and Taxation Code section 17942[1] and an order awarding attorney fees. In awarding the refund, the trial court concluded that former section 17942—a levy on limited liability companies registered to do business in California—is unconstitutional because the levy is measured by the limited liability company's total income, regardless of whether the income derived from or is attributable to business within the state. FTB contends this ruling was erroneous. As to the award of attorney fees, FTB urges that section 19717 is the exclusive means of obtaining attorney fees in a tax refund action; Northwest failed to establish entitlement to a recovery of attorney fees under Code of Civil Procedure section 1021.5 and the common fund doctrine; and the court erred in awarding fees in an amount several times greater than the lodestar.

We hold that former section 17942, as applied to Northwest in the years in question, violated the commerce clause of the United States Constitution (Commerce Clause), and that Northwest is entitled to a refund. We further hold, however, that the trial court's order does not support an award of attorney fees greater than the lodestar. We therefore reverse the attorney fees order and remand for further consideration of the attorney fees award consistent with this opinion.

## I. *FACTS AND PROCEDURAL HISTORY*

At all times relevant to this appeal, Northwest was a limited liability company (LLC) organized under the laws of the State of Washington, with business locations in Washington and Oregon. It engaged in the business of distributing explosives and explosives-related services to customers in Washington, Montana, Oregon, and Idaho. Northwest had no operations, property, inventory, employees, agents, independent contractors or place of business in California. Nor did it solicit customers in California or make any deliveries to customers in California.

Northwest nonetheless registered as an LLC with the California Secretary of State pursuant to Corporations Code section 17451 in June 1997. In years following, it filed tax returns with the FTB and untimely paid an $800 minimum tax imposed under section 17941. It did not, however, pay an amount imposed under former section 17942, based on an LLC's "total income from all sources reportable to this state for the taxable year." (Former § 17942, subd. (a).) The parties agree that this amount (the Levy) is imposed

---

[1] Revenue and Taxation Code section 17942 was amended in 2007. (Stats. 2007, ch. 381, § 2; see *post,* fn. 21.) For clarity, we refer to the version of the statute at issue in this appeal as former section 17942. Unless otherwise indicated, all further section references are to the Revenue and Taxation Code.

on the LLC's statutorily defined "total income," wherever earned, without apportionment according to the percentage of business or income attributable to activities in California.

FTB subsequently notified Northwest that it owed $27,458.13 for amounts due under the Levy, along with late payment penalties and interest, for tax years 1997, 1999, 2000, and 2001 (years in issue). Northwest paid the $27,458.13 and cancelled its registration with the Secretary of State effective June 13, 2002.

Northwest filed a claim for refund, which FTB denied. Northwest thereafter exhausted its administrative remedies, including appealing the FTB's decision to the State Board of Equalization, without success.

Northwest filed this lawsuit in January 2005, seeking a refund of the amounts it paid for the Levy, penalties, and interest. Among other things, Northwest alleged that the Levy was unconstitutional on its face and as applied, because former section 17942 contained no method for apportioning the Levy to the proportionate amount of income earned in California and, therefore, discriminated against interstate commerce and violated due process and equal protection rights.

A court trial was conducted based upon the parties' joint stipulation of facts and their stipulation regarding documents that could be admitted into evidence without objection. After the parties submitted trial briefs and the court held oral argument, the court issued a proposed statement of decision. FTB filed objections, to which Northwest replied. In the statement of decision, filed April 13, 2006, the court found that the Levy violated both the Commerce Clause and due process clause (Due Process Clause) of the United States Constitution. Accordingly, the Levy could not be applied to Northwest and Northwest was entitled to a refund of all amounts paid. In May 2006, the court entered judgment ordering a refund of $27,458.13 to Northwest, plus interest and costs to be determined.

FTB filed a notice of appeal from the judgment in July 2006. (Appeal No. A114805.)

Northwest thereafter filed a motion for attorney fees and costs, seeking $5 million in attorney fees. As explained further *post*, Northwest contended that it was entitled to attorney fees under the private attorney general doctrine, codified in Code of Civil Procedure section 1021.5, and the common fund doctrine, that its reasonable attorney fees amounted to $214,287.50, and that this lodestar amount should be adjusted upward due to numerous factors as well as the significance of the benefit counsel obtained for LLC's. After

briefing and oral argument, in August 2006 the court awarded Northwest $3.5 million in attorney fees under Code of Civil Procedure section 1021.5 and the common fund doctrine.

FTB filed notices of appeal from the attorney fees order in October 2006 (appeal Nos. A115841 & A115950).

On December 13, 2006, we granted FTB's motion to consolidate appeal Nos. A114805, A115841, and A115950, pursuant to the parties' stipulation.[2]

## II. *DISCUSSION*

The parties raise the following issues: (1) whether the Levy set forth in former section 17942 is a tax or a fee; (2) whether the Levy violates the Due Process or Commerce Clauses of the United States Constitution; and (3) whether the trial court erred in its award of attorney fees to Northwest.

### A. *Is the Section 17942 Levy a Tax or a Fee?*

At the outset, the parties strenuously debate whether the Levy constitutes a tax or a fee. We first address the context of the Levy and then, based on its legislative history, conclude that it more closely resembles a tax.[3]

---

[2] On April 23, 2007, the FTB filed a request for judicial notice of a corrected declaration filed in *Ventas Finance I, LLC v. FTB* (Super. Ct. S.F. City and County, 2005, No. 05-440001) (*Ventas Finance*), pertaining to the estimated revenue losses likely resulting from the trial court's decision in this case, and the FTB analysis of Assembly Bill No. 1614 (2005–2006 Reg. Sess.) (Assembly Bill 1614) (estimating the revenue impact of apportioning the Levy) issued on April 19, 2007. We deferred our ruling on the request. We now grant it. On October 18, 2007, the FTB filed a request for judicial notice of legislative history purportedly relevant to its contention that the trial court erroneously awarded attorney fees. Northwest objected to the request, moved to strike part of FTB's reply brief for introducing new issues, and alternatively sought leave to file an additional brief to address arguments raised in the reply brief. We deferred our ruling. We now grant the FTB's October 18 request for judicial notice and deny Northwest's motion to strike and request to file an additional brief.

[3] In arguing whether the Levy constitutes a fee or a tax, the parties rely primarily on cases decided under Proposition 13 (Cal. Const., art. XIII A). (See, e.g., *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 869, 872–873 [64 Cal.Rptr.2d 447, 937 P.2d 1350] (*Sinclair Paint*); *California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 939 [94 Cal.Rptr.2d 535] (*Professional Scientists*).) In those cases, the distinction between fees and taxes was critical, because a "special tax" within the meaning of Proposition 13 requires passage by a two-thirds vote. (*Sinclair Paint, supra,* at pp. 872–873; *Professional Scientists, supra,* at p. 939.) Here, for reasons we discuss *post,* whether the Levy is a tax or a regulatory fee is less significant. We nonetheless address the issue for clarity of our analysis and in light of FTB's further contention that a different constitutional test applies to fees. We do not determine whether the Levy might constitute a tax or a fee in any context other than the one squarely raised by this appeal.

### 1. *LLC's, Former Section 17942, and the Statutory Scheme*

The Levy was enacted in 1994 as part of the Beverly-Killea Limited Liability Company Act (LLC Act). Codified as new title 2.5 to the Corporations Code (Corp. Code, § 17000 et seq.) with conforming amendments to other codes such as the Revenue and Taxation Code, the LLC Act authorized for the first time the formation, operation, and regulation of LLC's within California. Before the enactment, a business entity could form in California only as a corporation, partnership, or sole proprietorship.

■ An LLC is a hybrid entity that offers certain advantages over corporations and partnerships by combining aspects of each. Like a corporation, an LLC is a distinct legal entity and its members (owners) have limited liability for the entity's debts and obligations; LLC's thereby provide an advantage over certain partnerships and sole proprietorships. (Corp. Code, §§ 17001, subds. (t), (x), (z), 17101.) Like a partnership, an LLC's members may participate actively in the management of the organization, thus offering an advantage over certain corporations. (See Corp. Code, § 17150; see 9 Witkin, Summary of Cal. Law (2001 supp.) Corporations, § 43A, p. 346 (Witkin).) Moreover, unless it elects otherwise, an LLC is a pass-through entity for tax purposes, akin to a partnership or S corporation (but without certain other limits placed on S corporations). Profits are not taxed at the entity level but are instead passed through to members and taxed on an individual basis, thus avoiding the double-taxation aspect of a C corporation.

In light of the growing popularity of LLC's, the California Legislature enacted the LLC Act with the aim of expanding California's competitive business environment. (9 Witkin, *supra*, at p. 346.) A Senate Rules Committee report for Senate Bill No. 469 (1993–1994 Reg. Sess.) (Senate Bill 469), the bill from which the LLC Act derived, stated in part: "The bill is intended to conform with the trend in other states to provide a new organizational vehicle for small and medium sized businesses, which would grant their owners limited liability, but at the same time allow them to be treated as partnerships for federal purposes (at considerable tax savings) and to receive preferential tax treatment by the state in comparison with corporate tax treatment. Sponsors argue that the availability of LLC status will improve California's business climate by facilitating formation of new businesses in California. Sponsors are further concerned that for lack of LLC legislation, the status of activities conducted by foreign LLCs will not be clear, which may reduce their enthusiasm for doing business in California." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 469 (1993–1994 Reg. Sess.) as amended Jan. 26, 1994, p. 3.)

■ The LLC Act, among other things, sets forth: requirements for the formation of LLC's; regulations concerning the allocation of profits and

losses, distributions of money and property, withdrawal of membership, assignment of interests, and dissolution of LLC's; requirements for the registration of foreign LLC's with the Secretary of State and penalties for violating the prohibition against transacting business without registration; and filing and tax requirements for LLC's, with conforming changes to existing law.

Under the LLC Act, an LLC forms in California by the filing of articles of incorporation with the Secretary of State. (Corp. Code, § 17050, subd. (a).) An LLC organized outside of California (like Northwest), must register with the Secretary of State before transacting intrastate business in California. (Corp. Code, § 17451, subd. (a).)

As the result of registering with the Secretary of State, the LLC Act requires LLC's to pay the annual minimum tax set forth in section 17941. (See Corp. Code, § 17050, subd. (d) [domestic LLC's]; Corp. Code, § 17451, subd. (d) [foreign LLC's].)[4] Similarly, section 17941 provides that the annual minimum tax must be paid by LLC's doing business in the state or having had its articles of incorporation accepted or certificate of registration issued by the Secretary of State. (§ 17941, subds. (a), (b).)

An LLC thus subject to the tax imposed by section 17941 is also required to pay the Levy pursuant to former section 17942. Subdivision (a) of former section 17942 read: "In addition to the tax imposed under Section 17941, every limited liability company subject to tax under Section 17941 shall pay annually to this state a fee equal to" specified amounts dependent upon the amount of "the total income from all sources reportable to this state for the taxable year." "Total income" is defined as "gross income, as defined in [s]ection 24271, plus the cost of goods sold that are paid or incurred in connection with the trade or business of the taxpayer." (See former § 17942, subd. (b)(1).) As mentioned, the parties agree that this definition refers to the LLC's statutorily defined "total income," wherever earned, and without apportionment according to the percentage of business or income attributable to activities within California.[5] (See FTB's 1997 form 568 booklet [LLC's " 'Total Income from all sources reportable to California . . . means income . . . before taking into account [any] apportionment and allocation.' "].) Proceeds from the Levy are deposited into the state's general fund.

---

[4] LLC's also have the option to elect to be treated for tax purposes as a corporation. We discuss this matter *post*.

[5] Because of the parties' agreement on this point, we do not decide whether the statutory phrase "all sources reportable to this state" should be interpreted to imply apportionment to California activities. As will be seen in our discussion *post*, such an interpretation would appear inconsistent with legislative history, as well as the parties' positions.

### 2. The Tax–Fee Distinction

■ The distinction between a tax and a fee has been well discussed in Proposition 13 cases. The essence of a tax is that it raises revenue for general governmental purposes and is "compulsory rather than imposed in response to a voluntary decision . . . to seek . . . benefits." (*Sinclair Paint, supra*, 15 Cal.4th at p. 874; see *Professional Scientists, supra*, 79 Cal.App.4th at p. 944 ["Ordinarily, 'taxes are imposed for revenue purposes, rather than in return for a specific benefit conferred or privilege granted' and '[m]ost taxes are compulsory rather than imposed in response to a voluntary decision to develop or to seek other government benefits or privileges.' "].) A fee, on the other hand, funds a regulatory program or compensates for services or benefits provided by the government. (*Sinclair Paint, supra*, at pp. 874–875.)

The question, therefore, is whether the Levy is a compulsory payment imposed for the purpose of raising revenues for general governmental purposes, or whether it funds a regulatory program or compensates for government services or benefits voluntarily sought by the LLC. Whether the Levy is a tax or a fee is a question of law that we decide de novo upon an independent review of the record. (*Sinclair Paint, supra*, 15 Cal.4th at p. 874.)[6]

### 3. Statutory Language

We begin by looking at the words of the statute, giving them their usual and ordinary meaning. (*Lennane v. Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].) Former section 17942, subdivision (a) read: "In addition to the tax imposed under Section 17941, every limited liability company subject to tax under Section 17941 shall pay annually to this state a *fee* equal to" specified amounts dependent upon the amount of "the total income from all sources reportable to this state for the taxable year." (Italics added.) Although the Legislature plainly labeled the Levy as a "fee," the statutory language does not indicate whether the Levy is imposed for purposes of raising general governmental revenue, for funding benefits and services, or for funding a regulatory provision. (Cf. *Sinclair Paint, supra*, 15 Cal.4th at pp. 871–872; *Professional Scientists, supra*, 79

---

[6] The parties refer us to a number of cases pertaining to the burden of proof, albeit in disparate contexts. (*Consolidated Accessories Corp. v. Franchise Tax Board* (1984) 161 Cal.App.3d 1036, 1039 [208 Cal.Rptr. 74] [taxpayer bears the overall burden of proof in a tax refund lawsuit]; *Professional Scientists, supra*, 79 Cal.App.4th at p. 945 [in Proposition 13 case, the government bears the burden of proving whether the assessment is a fee or a tax]; *Mission Housing Development Co. v. City and County of San Francisco* (1997) 59 Cal.App.4th 55, 78–79 [69 Cal.Rptr.2d 185] ["The party challenging the constitutionality of a statute bears the burden of proving it unconstitutional."].) Regardless of how we assign the burden of proof in this case, we would reach the same conclusions.

Cal.App.4th at p. 940.) Labeling the Levy a fee is not determinative of its nature. (*Weekes v. City of Oakland* (1978) 21 Cal.3d 386, 392–394 [146 Cal.Rptr. 558, 579 P.2d 449] [employee license "fee" measured by employee's gross receipts constituted an occupation tax notwithstanding its label as a fee].)

As for the broader statutory scheme, the LLC Act reflects to some extent an effort to regulate LLC's in California. (See, e.g., Corp. Code, § 17000 et seq.) The statutory language does not, however, identify any connection between the Levy and this regulatory activity or its costs or benefits. (See *United Business Com. v. City of San Diego* (1979) 91 Cal.App.3d 156, 165 [154 Cal.Rptr. 263] [" ' "If revenue is the primary purpose and regulation is merely incidental the imposition is a tax; [but if] regulation is the primary purpose the mere fact that . . . revenue is also obtained does not make the imposition a tax." ' "].) To determine whether the Levy is a tax or a fee, we must turn to its legislative history.

### 4. *Legislative History Demonstrates the Levy's Purpose Was to Raise Revenue*

The legislative history of the LLC Act demonstrates unequivocally that the Levy's purpose was to raise revenue in order to make up for the loss of income tax proceeds that would result if entities were formed and operated as LLC's instead of corporations. To reach this conclusion, one need look no further than the FTB's own analyses of Senate Bill No. 930 (1993–1994 Reg. Sess.) (Senate Bill 930) and Senate Bill 469, which led to the enactment of the LLC Act.

Due to the favorable tax treatment of LLC's, it was believed that fewer businesses would choose to operate as corporations. This would decrease the state's revenue from corporate income taxes: a C corporation at the time was taxed at a rate of 9.3 percent on net income, an S corporation was taxed at a 1.5 percent rate, but an LLC would have no entity tax on net income. FTB thus projected that if the LLC Act included no new sources of revenue, state tax revenues would decrease "in the $690 million range" over a five-year period. As confirmed in the FTB's analysis of Senate Bill 930 on August 11, 1993, these revenue losses would result from "avoidance of the entity-level tax (both measured and minimum tax) and operating loss deductions that would be available to members of LLCs."

The Legislature therefore added two revenue-raising provisions—an $800 minimum tax (see § 17941) and the Levy (see former § 17942) to the legislation, expressly intending to render it "revenue neutral"—that is, to replace the projected lost income tax revenues. A letter from the author of

Senate Bill 469, Senator Beverly, to Governor Wilson, dated August 31, 1994, states: "The tax provisions [of Senate Bill 469] have been carefully crafted to ensure the measure is revenue neutral. It accomplishes this in two ways: a) by imposing an annual $800 minimum tax (equal to the corporate minimum franchise tax), and b) by imposing a fee based upon the entity's gross income." (Sen. Robert G. Beverly, letter to Governor Pete Wilson, Aug. 31, 1994.) Similarly, a Senate Rules Committee report on Senate Bill 469 quoted the California Chamber of Commerce as follows: " 'As proposed by this bill, there is no revenue loss to the State of California. LLCs would pay the regular $800 corporate or franchise fee and a second LLC fee based on gross receipts. In addition, the investors in the LLC pay taxes at the investor level. The Franchise Tax Board estimates that the measure is revenue neutral.' " (Sen. Rules Com., Off. of Sen. Floor Analyses, Rep. on Sen. Bill No. 469 (1993–1994 Reg. Sess.) as amended Jan. 26, 1994, p. 3.) In fact, the FTB's analysis of Senate Bill 469 in February 1994, factoring in the $800 minimum tax and fee, projected a revenue *gain* of $14 million over the period 1994–1995 through 1997–1998.

To ensure that the Levy and $800 minimum tax would make up for revenue losses, Senate Bill 469 also required FTB to analyze annually the revenue impact of the LLC Act and to adjust the amount of the Levy to maintain revenue neutrality. (See Franchise Tax Bd., Methodology for the Limited Liability Company Fee Adjustment Calculation (Aug. 9, 1994).) As stated in Senator Beverly's letter to Governor Wilson: "In addition, the measure contains intent language calling for a review by the Franchise Tax Board after the first two years of operation to determine if the initial assumptions used in computing the fees are correct. If, in the out years, revenues drop off and the bill is no longer revenue neutral, the Franchise Tax Board would be authorized to adjust the fees to eliminate any fiscal impact on the state." (Sen. Robert G. Beverly, letter to Governor Pete Wilson, Aug. 31, 1994.) The FTB's bill analysis for Senate Bill 469 read: "For taxable years beginning on or after January 1, 1999, the Franchise Tax Board would be required to conduct a study focusing on the tax revenue impact, if any, of recognizing LLCs. The purpose of the study would be to determine if the recognition of LLCs results in an increase or decrease in state tax revenues." (FTB, Analysis of Sen. Bill No. 469 (1993–1994 Reg. Sess.) Feb. 17, 1994.) To this end, the FTB would "[c]ompare the state tax revenue that would have been generated by business entities (e.g., S corporations, general corporations, limited partnerships, etc.) that convert to LLCs had they not reorganized as LLCs with the revenue generated by the minimum tax [§ 17941] and schedule of fees [former § 17942] which the entities would be subject to as

LLCs", and "adjust the schedule of fees to offset any increase or decrease in state income tax revenues discovered as a result of the study."[7]

Aside from the Legislature's plain intent to impose the Levy in order to make up for lost income tax revenues, there are other indications that the Levy constitutes a tax rather than a fee. As with state income tax proceeds, proceeds from the Levy are deposited in the state's general fund for general governmental purposes. In addition, the Legislature chose for the Levy to be administered by the FTB according to the state's provisions for administering California income taxes, rather than to the State Board of Equalization or to California's Fee Collection Procedures Law (§ 55001 et seq.; former § 17942, subd. (c) [the Levy "shall be collected and refunded in the same manner as the taxes imposed by this part [pt. 10, personal income tax], and shall be subject to interest and applicable penalties"].)

### 5. *FTB's Argument That the Levy Is a Fee Is Unpersuasive*

The FTB's primary argument is that the Levy constitutes a "regulatory fee" because it was enacted as part of the LLC Act, which allowed for the formation, registration and *regulation* of LLC's.[8] (See *Professional Scientists, supra*, 79 Cal.App.4th at p. 950.) In particular, FTB contends, the Legislature enacted former section 17942 pursuant to its police power (Cal. Const., art. IV, § 8) to impose a regulatory fee on entities seeking the benefits of the LLC business form and limited liability protection for their members. The FTB further notes that the LLC Act was enacted as an urgency measure "[i]n order to help stem the flow of business and jobs from California, protect the rights of Californians dealing with limited liability companies, and improve California's business climate and tax base . . . ."

The FTB's argument has no merit. A "regulatory fee" is an imposition that funds a regulatory program. (*Professional Scientists, supra*, 79 Cal.App.4th at p. 950.) In the matter before us, there is no indication that the Levy funds any regulatory program; to the contrary, the legislative history demonstrates that the Levy was intended to make up for lost income tax revenues, and funds generated by the Levy are placed in the state's general fund. Nor is any regulatory *program* even mentioned in the legislative history or the LLC Act itself. While the LLC Act may set forth rules as to how LLC's may operate in

---

[7] The requirement of the FTB to conduct an annual study to adjust the LLC fees to the extent they would fully offset the revenue loss of allowing LLC's to operate in California was codified in former section 17943. (Stats. 1996, ch. 952, § 19.) In 2001, the section was repealed. (Stats. 2001, ch. 391, § 2.)

[8] Other types of fees recognized by California courts include special assessments, based on the value of benefits conferred on property, and development fees, which compensate the state for permits or governmental privileges. (*Sinclair Paint, supra*, 15 Cal.4th at p. 875.)

California, it does not include the type of regulatory program described in the cases on which the FTB relies. (See, e.g., *Sinclair Paint, supra,* 15 Cal.4th at pp. 871–872 [program of evaluation, screening and followup for lead contamination supported by fees paid by certain manufacturers]; *Professional Scientists, supra,* at pp. 939–940 [filing fee imposed to defray costs of managing and protecting fish and wildlife trust resources].)

In addition, the FTB fails to demonstrate any nexus between the Levy and the expense of any regulatory program. " '[T]o show a fee is a regulatory fee and not a special tax, the government should prove (1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity.' " (*Collier v. City and County of San Francisco* (2007) 151 Cal.App.4th 1326, 1346 [60 Cal.Rptr.3d 698].) Here, FTB has established neither requirement. It offered no evidence as to the estimated cost of any service or regulatory activity attributable to Northwest or LLC's in general. Although FTB claims the Legislature, in setting the amount of the Levy, made "determinations" regarding the value of the benefits of the LLC Act and evaluated the impact or burden of allowing LLC's to operate in California, FTB has not supported its claims by citations to the record. Nor has FTB shown that charges allocated to an LLC bear a fair or reasonable relationship to the LLC's burdens on or benefits from the regulatory activity. It argues that the four tiers of former section 17942, imposing a different tax depending on the amount of the LLC's total worldwide income, reflects the Legislature's decision to apportion the Levy according to the amount of the LLC's business. But there is no indication of such legislative intent in the legislative history, or any indication why a tax based on the worldwide income of the LLC would reflect a fair apportionment among LLC's for the funding of a California regulatory program.[9]

*Professional Scientists,* on which FTB relies for its regulatory fee argument, confirms that the Levy is not a valid regulatory fee. The court in *Professional Scientists* stated: " 'A regulatory fee may be imposed under the police power *when the fee constitutes an amount necessary to carry out the purposes and provisions of the regulation.*' " (*Professional Scientists, supra,* 79 Cal.App.4th at p. 945, italics added.) In the matter before us, there is no

---

[9] In an earlier version of Senate Bill 469, the Levy *did* provide for apportionment, in the sense that the fee would be imposed only on "receipts derived from or attributable to sources within this state." It is not altogether clear from the record how or why this language was changed. Given the oft-stated legislative desire to maintain revenue neutrality, a reasonable inference is that legislators were concerned that the revenue generated from a fee based only on receipts derived from or attributable to sources within this state would not be sufficient. In other words, California would lose money unless the "fee" was imposed on non-California business.

indication that the fee constitutes an amount necessary to carry out whatever regulation is afforded by the LLC Act. To the contrary, the revenue generated by the Levy appears to far exceed any reasonable cost of regulating or providing services to LLC's. Based on evidence provided by Northwest, comparing the LLC fees collected in each of the calendar years 1997–2002 with the fiscal year budgets of the Secretary of State for fiscal years 1996–1997 through 2001–2002, the Levy's proceeds were more than half of or exceeded the *entire* budget of the Secretary of State. The Secretary of State, of course, does more than regulate LLC's. (See Gov. Code, § 12159 et seq. [describing duties of the Secretary of State].) Indeed, under the heading "FISCAL IMPACT," the FTB's analysis of Senate Bill 469 indicated that "[t]he costs associated with implementing and administering this bill are not expected to be substantial." Under *Professional Scientists*, even if the Levy did constitute a regulatory fee, it would be invalid because it surpasses the costs of the regulatory program it purportedly supports.

In a related but conceptually different argument, the FTB contends that the Levy constitutes a fee because it is imposed in exchange for benefits LLC's obtain upon voluntarily registering in California. (See *Professional Scientists, supra*, 79 Cal.App.4th at p. 944 [noting distinction between regulatory fees and fees imposed in exchange for benefits].) For example, the FTB argues: "The Legislature determined that the value of the above benefits [what an LLC can do in California] to a business entity, and the LLC fee the entity would pay for these benefits, would be measured by the size of the business as expressed by the amount of its 'total income.' . . . Similarly, the Legislature determined that the benefits to LLCs and their members would increase proportionally with the size of the business, and the resulting fee was apportioned among LLCs based on the size of the business." Again, however, there is no indication in the legislative history, or anything else in the record, suggesting that the LLC fees are necessary for the state to be able to provide services or benefits to LLC's in California.[10]

FTB attempts to explain away the fact that the proceeds of the Levy are deposited into the general fund, arguing that the existence of a special fund is not dispositive of whether the Levy constitutes a tax or a fee. (Citing *Professional Scientists, supra*, 79 Cal.App.4th at p. 942 ["The fact that Fish and Game does not operate an independent regulatory program with a

---

[10] The FTB also argues: "In order to fiscally be able to offer the LLC business form to those entities seeking it, the Legislature enacted revenue neutral legislation to regulate LLCs and protect California citizens." It is unclear whether the FTB means by this argument that the Levy is a regulatory fee because it funds a regulatory program, the Levy is a fee because it reflects the cost of services or benefits obtained by LLC's in exchange for registration, or simply that the Levy makes up for revenue by entities forming as LLC's rather than corporations. The first two alternatives are meritless for reasons discussed in the text. The latter alternative confirms that the Levy is a tax.

correlative accounting system does not detract from its regulatory role"].) FTB's reliance on *Professional Scientists* in this regard is misplaced. The proceeds in that case were deposited in the Department of Fish and Game's "preservation fund" to defray a portion of that department's costs incurred for its environmental review required by state law. (*Professional Scientists, supra,* at p. 951.) The fees were set to cover the department's costs and were annually reviewed and adjusted to ensure the costs were fully covered. (*Id.* at p. 941.)

The FTB also argues that the Levy goes into the general fund rather than a special fund because the benefits provided to LLC's under the LLC Act are public services and facilities that are paid from the general fund and administered by several different government agencies. In addition to regulation by the Secretary of State, the FTB posits, services are provided by the FTB (processing an LLC's form 568 income tax return, auditing form 568, sending notices indicating when an assessment is not paid and taking collection actions, and providing reports to the Legislature as required) and agencies involved in refund lawsuits (the State Board of Equalization (SBE), the attorney general's office, and the superior court).

FTB's argument is unconvincing. It provides no evidence of the costs of these activities or how the costs relate to the amount of the Levy. Furthermore, agencies cited by the FTB, such as the Attorney General and the superior court, do not confer benefits directly upon Northwest or incur costs specific to LLC's. Instead, the costs they incur are part of their provision of services to the general public. There is no indication that these services or costs will increase due to the formation of LLC's under the LLC Act.

In any event, the Legislature provided sources *other* than the Levy to compensate the FTB and the Secretary of State for the costs of implementing the LLC Act. The Legislature appropriated $350,000 to the FTB for the first year of the LLC Act's implementation. (See Stats. 1994, ch. 1200, § 94, p. 7411 ["For purposes of implementing and administering this act in the 1994–1995 fiscal year, the sum of three hundred fifty thousand dollars ($350,000) is hereby appropriated from the General Fund to the Franchise Tax Board, in augmentation of Item 1730-001-001 of the Budget Act of 1994. It is the intent of the Legislature that the funds required to administer this act for the 1995–1996 fiscal year and each fiscal year thereafter, shall be provided for in the annual Budget Act."].) The Legislature appropriated an additional $234,000 to the Secretary of State. (Stats. 1994, ch. 1200, § 27, p. 7296 [enacting Corp. Code, former § 17705, providing an appropriation of $234,000 to the Secretary of State from the Secretary of State's Business Fees Fund for expenditure in the 1994–1995 year, to be expended on the initial program costs and to initiate the development of an automated system

to support the program].) The legislation also included a separate schedule of filing fees to reimburse the Secretary of State for ongoing costs associated with processing LLC filings. (Stats. 1994, ch. 1200, § 27, p. 7296 [enacting Corp. Code, former §§ 17700–17704, providing for LLC filing fees].) These filing fees are deposited into the Secretary of State's Business Fees Fund, which is intended to cover the cost of the program it supports. (Gov. Code, § 12176, subd. (b) ["It is the intent of the Legislature that moneys deposited into the Secretary of State's Business Fees Fund shall be used to support the programs from which fees are collected [and] that fees shall be sufficient to cover the costs of these programs . . . ."].)

Applying the distinction between fees and taxes set forth in *Sinclair Paint* and *Professional Scientists*, we conclude that the Levy more closely resembles a tax.

### B. *Is the Levy Unconstitutional?*

We next determine whether the Levy is constitutional. Because we conclude that imposition of the Levy as to Northwest during the years in issue violated the Commerce Clause, we need not, and do not, decide whether former section 17942 is unconstitutional on its face or whether it violates due process.[11]

■ Article I, section 8, clause 3 of the United States Constitution states in pertinent part that the powers granted to Congress include the power "[t]o regulate commerce . . . among the several States." By implication, the Commerce Clause prohibits state taxation or regulation "that discriminates against or unduly burdens interstate commerce and thereby 'imped[es] free private trade in the national marketplace.' " (*General Motors Corp. v. Tracy* (1997) 519 U.S. 278, 287 [136 L.Ed.2d 761, 117 S.Ct. 811] (*GMC*).) This is often referred to as the dormant Commerce Clause. (*GMC*, at p. 287; see *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.* (1995) 514 U.S. 175, 179 [131 L.Ed.2d 261, 115 S.Ct. 1331] (*Jefferson Lines*).)

For decades, state statutes that impose taxes on income earned outside the state's jurisdiction, or that fail to apportion total income in accordance with

---

[11] In general, a statute may be facially unconstitutional if there are no circumstances under which it can be validly applied. (See *United States v. Salerno* (1987) 481 U.S. 739, 745 [95 L.Ed.2d 697, 107 S.Ct. 2095]; *Sanchez v. City of Modesto* (2006) 145 Cal.App.4th 660, 678–679 [51 Cal.Rptr.3d 821].) FTB argues that, even if unconstitutional as applied to Northwest in this case, former section 17942 may be constitutionally applied to other LLC's, including those formed and doing business solely within the state of California. Northwest also contended in its complaint that the Levy violated its due process rights. (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7, subd. (a).) FTB maintains that the Levy does not offend due process under a rational basis test, because the LLC Act provides legal rights and benefits for which the state asks a fee in return.

the income earned within the jurisdiction, have been held to violate the Commerce Clause. (See, e.g., *Gwin, Etc., Inc. v. Henneford* (1939) 305 U.S. 434, 439–440 [83 L.Ed. 272, 59 S.Ct. 325] [Washington tax "measured by the entire volume of the interstate commerce in which appellant participates," and "not apportioned to its activities within the state," violates Commerce Clause]; *Greyhound Lines v. Mealey* (1948) 334 U.S. 653, 662–664 [92 L.Ed. 1633, 68 S.Ct. 1260] [New York tax on gross receipts from transportation of passengers violates Commerce Clause to extent receipts were attributable to portion of mileage outside the state].) More recent cases confirm that the Levy is inconsistent with the Commerce Clause.

### 1.  *The* Complete Auto *Test and Internal and External Consistency*

■ In *Complete Auto Transit, Inc. v. Brady* (1977) 430 U.S. 274 [51 L.Ed.2d 326, 97 S.Ct. 1076] (*Complete Auto*), the United States Supreme Court acknowledged that a state tax may not violate the Commerce Clause if it (1) is "applied to an activity with a substantial nexus with the taxing State," (2) is "fairly apportioned," (3) does "not discriminate against interstate commerce," and (4) is "fairly related to the services provided by the State." (*Complete Auto, supra,* at p. 279; see *Jefferson Lines, supra,* 514 U.S. at p. 189 [applying *Complete Auto* test in upholding Oklahoma sales tax on full price of a bus ticket from Oklahoma to another state].) Northwest does not contend that the Levy (former § 17942) fails the first, third or fourth prongs of the *Complete Auto* test. The question is whether the Levy meets the second requirement, that it be fairly apportioned. (*Jefferson Lines, supra,* at p. 189.)

■ Fair apportionment requires both "internal consistency" and "external consistency." (*Jefferson Lines, supra,* 514 U.S. at p. 185.) "Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear." (*Ibid.*) Here, if the Levy were replicated in every state, an LLC engaging in business in multiple states with the same total income as Northwest would pay the maximum levy in every state in which it did business or registered to do business. An LLC operating only in one state would pay the maximum levy only once. Thus, the Levy places a greater burden on interstate commerce than intrastate commerce.

FTB contends that the internal consistency test is inapplicable and Northwest must by some other means demonstrate that the Levy burdens interstate commerce. For this proposition, FTB relies on *American Trucking Assns., Inc. v. Michigan Pub. Serv. Comm'n* (2005) 545 U.S. 429 [162 L.Ed.2d 407, 125 S.Ct. 2419] (*American Trucking*). FTB is incorrect.

In *American Trucking*, Michigan imposed a flat $100 annual fee upon trucks engaging in intrastate commercial hauling (undertaking point-to-point

hauls between Michigan cities). (*American Trucking, supra,* 545 U.S. at p. 431.) The petitioners challenged the fee on the ground that it discriminated against interstate carriers and unconstitutionally burdened interstate trade, because the fee was flat but trucks carrying both interstate and intrastate loads engaged in less intrastate business than trucks carrying only intrastate loads. (*Id.* at pp. 431–432.) The United States Supreme Court held that the fee did not violate the dormant Commerce Clause, because it was imposed upon only activities taking place exclusively within the state's borders, did not facially discriminate against interstate or out-of-state activities or enterprises, and applied evenhandedly to all carriers making domestic journeys. (545 U.S. at p. 434.) In addition, there was little if any evidence that the fee imposed any significant practical burden upon interstate trade or unfairly discriminated against interstate truckers. (*Id.* at pp. 434–435.) In response to the petitioners' argument that the fee failed the internal consistency test, the court conceded that if every state imposed such a fee, an interstate trucker doing local business in multiple states would have had to pay hundreds or thousands of dollars in fees if it supplemented its interstate business by carrying local loads in many other states. The court nonetheless found no Commerce Clause violation, because it would have to incur such fees only because it engaged in local business in all those states. (545 U.S. at p. 438.) "An interstate firm with local outlets normally expects to pay local fees that are uniformly assessed upon all those who engage in local business, interstate and domestic firms alike." (*Ibid.*)

*American Trucking* is distinguishable from the matter at hand. The Michigan fee in *American Trucking* was a flat fee, "which does *not* seek to tax a share of interstate transactions, which focuses upon *local* activity, and which is assessed evenhandedly." (*American Trucking, supra,* 545 U.S. at p. 438, italics added.) Here, by contrast, the Levy is not a flat fee imposed on all LLC's for the privilege of doing business locally in California, but a percentage of the LLC's total *worldwide* income, which therefore *does* tax a share of interstate transactions. Moreover, the court in *American Trucking* did not *reject* the internal consistency requirement altogether. Instead, it found no Commerce Clause violation notwithstanding the absence of internal consistency, because the petitioners would incur intrastate (*local*) fees in multiple states only by engaging in local business in those states. Here, by contrast, an LLC incurs the Levy based on its total *worldwide* income merely by registering with the state, even if it does no business there.

In any event, the Levy does not meet the requirement of *external* consistency. "External consistency . . . looks . . . to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." (*Jefferson Lines, supra,* 514 U.S. at p. 185.)

■ Here, the economic justification for the Levy is either the revenue necessary to make up for the decrease in corporate taxes or, according to FTB, the funds necessary to provide certain benefits to LLC's in California. Because the Levy is measured by the LLC's total income wherever earned, and not just what is earned in California, the Levy "reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State." (*Jefferson Lines, supra*, 514 U.S. at p. 185.) The fact that the Levy is based on non-California income, not attributable to activities in California, amounts to extraterritorial taxation. FTB has not addressed the issue of external consistency in this appeal. Failing to meet the internal consistency and external consistency requirements, the Levy as applied to Northwest violated the Commerce Clause.

2. *Levy Under Former Section 17942 Would Be Unconstitutional Under* Pike

The FTB argues that, as a fee, the Levy would be valid under a balancing test articulated in *Pike v. Bruce Church, Inc.* (1970) 397 U.S. 137 [25 L.Ed.2d 174, 90 S.Ct. 844] (*Pike*). We disagree.

In *Pike*, a regulation dictated the manner of packing cantaloupes grown in Arizona. Its practical effect would have compelled the appellee company to build packing facilities in Arizona at a cost of approximately $200,000. The United States Supreme Court described the Commerce Clause standard as follows: "Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. [Citation.] If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." (*Pike, supra*, 397 U.S. at p. 142.) The court found that although the law was supported by a legitimate state interest, the interest did not justify the requirement that the appellee build and operate an unneeded $200,000 packing plant in the state. One state may not require business operations to be performed within the state if they could be performed more efficiently elsewhere. (*Id.* at p. 145.)

FTB's reliance on *Pike* is misplaced. First of all, *Pike* is distinguishable factually, since it pertained not to a monetary imposition like the Levy but to

a regulation dictating the manner of packing cantaloupes grown in Arizona. Indeed, contrary to FTB's argument, *Pike* did not even involve a "fee."[12]

In any event, the Levy would not pass the *Pike* test, which requires the following: (1) the statute regulates evenhandedly to effectuate a legitimate local public interest; (2) its effects on interstate commerce are only incidental; and (3) the burden imposed on such commerce is not clearly excessive in relation to the putative local benefits. (*Pike, supra*, 397 U.S. at p. 142.)

As to the first requirement, we will assume that the Levy supports a legitimate state interest in allowing LLC's to form in California while rendering state income tax revenues neutral, but we question whether this interest is effectuated evenhandedly: it is evenhanded in the sense that interstate and intrastate LLC's are charged on the same basis, but it is not evenhanded to the extent that those who do no California business are effectively paying for benefits they do not receive.

As to the second requirement, the impact on interstate commerce is not merely incidental. Although FTB argues that the Levy amounted to less than 0.2 percent of Northwest's total income, FTB provides no authority that a charge of 0.2 percent of an entity's total income is a constitutionally permissible increase in the cost of interstate commerce.

Moreover, even if the Levy met the first two *Pike* requirements, it could not be upheld under *Pike* because the burden it imposes on interstate commerce is clearly excessive in relation to local benefits. In this regard, FTB argues that Northwest received many benefits—related to its ability to do business in California and its members enjoying limited liability—which are extremely valuable compared to a fee of less than 0.2 percent of total income. In fact, however, Northwest received *no* benefits, since it did not transact any business in California. Nor is there any indication that the Levy actually funds the benefits provided by the LLC Act.

---

[12] For this and other reasons, we do not share the view that it makes a difference whether the Levy is characterized as a tax or a fee for Commerce Clause purposes. The Commerce Clause applies to taxes and regulations that discriminate against or unduly burden interstate commerce. (See, e.g., *GMC, supra*, 519 U.S. at p. 287.) FTB relies on *Pike* to argue a different test applies to fees, but *Pike* did not involve a fee. Furthermore, both a fee and a tax were subjected to the fair apportionment requirement, without any analytical distinction between the two, in *American Trucking Assns., Inc. v. Scheiner* (1987) 483 U.S. 266, 282–287 [97 L.Ed.2d 226, 107 S.Ct. 2829] (applying internal consistency test in invalidating a flat "identification marker fee" and a flat "axle tax" because they resulted in a higher charge per mile for out-of-state vehicles). *Woosley v. State of California* (1992) 3 Cal.4th 758 [13 Cal.Rptr.2d 30, 838 P.2d 758] (*Woosley*)—a case on which FTB relies for other purposes—applied the *Complete Auto* test to strike down a license "fee" and a use "tax." (*Woosley, supra*, at pp. 777–783.)

■ We note as well that the LLC Act authorized the formation of new LLC's under California law at a time when the FTB was already taxing foreign LLC's on a pass-through basis as partnerships. Thus, the revenue loss anticipated by the LLC Act was due primarily to the prospect of *California* entities forming as LLC's rather than as corporations—in other words, the Levy was set up to combat revenue loss stemming not from foreign business entities, but domestic business entities. Saddling a non-California entity with a levy based on non-California business to recoup amounts lost from California entities certainly does not promote interstate commerce. Because of the Levy's burden on interstate commerce, it would not pass muster under *Pike*, even if the *Pike* test applied.

In sum, whether the Levy is called a tax or a fee, and whether we apply the internal consistency test, the external consistency test, or the *Pike* balancing test, the application of the Levy to Northwest in the years in issue violated the Commerce Clause.

### 3. *FTB's Voluntary Choice Argument Is Meritless*

FTB argues that the Levy did not violate the Commerce Clause, and in fact Northwest cannot even bring a Commerce Clause challenge, because Northwest voluntarily registered as a foreign LLC and did not elect to be taxed as a corporation, which would have avoided the imposition of the Levy. (See § 18633.5, subd. (h) [requiring LLC's that are classified as corporations to pay tax as a corporation].)[13] Thus, FTB argues, the Levy was imposed solely as a result of Northwest's election as between two options: (1) to be taxed under a scheme which involves income apportionment; or (2) to forgo the apportioned tax and be subject to the Levy under former section 17942. Because of this voluntary election, FTB maintains, the Levy does not place a burden on the flow of commerce across California's borders that commerce wholly within those borders would not bear.

FTB bases its argument on *United States Borax & Chemical Corp. v. Carpentier* (1958) 14 Ill.2d 111 [150 N.E.2d 818, 824] (*Carpentier*). In *Carpentier*, a Nevada corporation challenged franchise taxes and license fees it paid under protest pursuant to the Illinois Business Corporation Act.

---

[13] By default, the FTB treats an LLC as a pass-through tax entity: an LLC with more than one member as a partnership and an LLC with one member as a sole proprietorship. The LLC files California form 568 (limited liability company return of income) and pays an $800 tax (§ 17941) and amounts due under the Levy (former § 17942) based on total annual gross worldwide income. However, the LLC has the option of being taxed as a corporation by filing an election with the Internal Revenue Service, which the FTB honors. As a corporation, the LLC files California form 100 and is taxed at the corporate tax rate, in an amount not less than the minimum tax of $800. (<www.ftb.ca.gov/businesses/bus_structures/LLcompany.shtml> [as of Jan. 31, 2008].)

(*Carpentier, supra*, 150 N.E.2d at p. 820.) At the time Illinois authorized the plaintiff to conduct business in Illinois, the plaintiff filed an annual report electing to pay Illinois franchise tax on its *entire* stated capital and paid-in surplus, rather than on the basis of its property and business within the state. (*Ibid.*) In the next several months, however, the plaintiff increased its capital stock and paid-in surplus so that only about 2 percent of its property and business was in Illinois. (*Id.* at pp. 820–821.) The plaintiff also merged with a New Mexico corporation, which further increased its stated capital and paid-in surplus. (*Ibid.*) The plaintiff submitted to the state its computation of franchise taxes, license fees, and related amounts computed under the apportionment formula. (*Id.* at p. 821.) The state refused this offer and instead computed the amount due based on the entire increase in the stated capital and paid-in surplus, because the plaintiff had not timely filed an amended report changing to the apportionment formula. (*Ibid.*) Indeed, a provision in the state's Business Corporation Act specifically stated that a corporation electing to pay its tax upon the entire capital and paid-in surplus must be assessed on that basis unless the corporation timely changed its election. (*Carpentier, supra*, at p. 823.)

On appeal to the Illinois Supreme Court, the plaintiff in *Carpentier* nonetheless contended that the tax it was assessed violated the Commerce Clause, because the tax was measured by property and transactions outside of Illinois. (*Carpentier, supra*, 150 N.E.2d at p. 822.) The court held that there was no Commerce Clause violation, or the plaintiff had waived its right to complain of one, because the plaintiff was given but failed to avail itself of statutory choices to avoid the tax by, inter alia, timely electing a different method for calculating the tax. (150 N.E.2d at pp. 825–826.)[14] The plaintiff "made its voluntary election, stood by and confirmed it, and neglected or refused to take any step afforded by our statute until too late to better its position." (*Id.* at pp. 826–827.)

Aside from the fact that we are not bound by a 1958 decision from an Illinois state court in deciding the propriety of a 1994 California statute, *Carpentier* is readily distinguishable from the matter at hand. In the first place, the act constituting waiver in *Carpentier* was the failure to comply with a statute to amend a report to change the method of calculating a tax after acquiring additional assets; there is no corresponding or equivalent statute in the LLC Act. Moreover, as discussed below, the election in *Carpentier* was vastly different from the type of election the FTB would force Northwest and other LLC's to make here.

---

[14] In reaching this conclusion, the Illinois court relied on an earlier Illinois decision that held it was constitutional for Illinois to tax a corporation on the basis of all of its capital stock where the corporation failed to provide the necessary information to enable the state to assess the franchise tax on its stock in proportion to its business and property in Illinois. (*Carpentier, supra*, 150 N.E.2d at pp. 824–825.)

The basis for the decision in *Carpentier* was that the plaintiff failed to timely file an amendment to change the method with which its tax would be calculated in Illinois. Here, an election by Northwest to be taxed as a corporation rather than as a pass-through LLC would have more dramatic consequences. Among other things, such an election would require Northwest to make the same election with the Internal Revenue Service, thus changing the manner in which Northwest and its members would be taxed at the federal level, with likely similar changes in all the other states in which Northwest did business. Avoiding the double-taxation aspect of a corporation (by which the entity is taxed on profits and its members on distributions) is one of the hallmark benefits of an LLC. Indeed, in passing the LLC Act, our Legislature recognized this facet of LLC's as one of the major reasons for such interest in LLC's in the first place. The FTB now would have LLC's surrender this advantage not only in California, but in all other states in which the LLC pays taxes and on its federal tax returns as well, simply so California can impose a tax based on income generated *outside* of California. The idea that this could somehow ameliorate the burdens on interstate commerce, or insulate the Levy from scrutiny under the Commerce Clause altogether, is simply untenable. Nor do we think that LLC's—which our Legislature wanted to *attract* to California in passing the LLC Act—should be forced to endure an unconstitutional assessment merely because they proceeded under the auspices of a California statute (former § 17942).

Indeed, the FTB's argument is difficult to accept, because its implication is that the Levy could *never* be challenged: only an LLC that was subject to the Levy would have standing to bring a challenge; but under the FTB's theory an LLC that was subject to the Levy would be precluded from bringing such a challenge, since it never elected not to be subject to it.[15]

In the final analysis, the Levy as applied to Northwest violated the Commerce Clause. Northwest, which conducted no business in California, is entitled to a refund of the amounts it paid under former section 17942. The FTB agrees that the amount of a refund in this case would be the entire amount of the LLC fees at issue in the action below.[16]

---

[15] FTB makes other similar waiver and estoppel arguments, contending that Northwest's decision not to elect to be taxed as a corporation should permit the state to impose an unconstitutional tax. We note that Northwest never voluntarily paid the Levy and promptly filed a request for a refund after it did pay, and as far as we can see from the record has at all times maintained that it owed nothing under former section 17942. In any event, we have fully considered the arguments and authorities cited by FTB and, for much the same reasons as we reject the related contention in the text, we reject as well the FTB's additional waiver and estoppel theories.

[16] As a general matter, only the portion of the Levy that exceeds Commerce Clause limits must be refunded. (*Macy's Dept. Stores, Inc. v. City and County of San Francisco* (2006) 143

C. *Award of Attorney Fees*

In its motion for costs under Code of Civil Procedure section 1032, subdivision (b), Northwest sought $5 million in attorney fees under Code of Civil Procedure section 1021.5 and the common fund doctrine, as the prevailing party in the litigation. Counsel had pursued the lawsuit on Northwest's behalf on a contingency fee basis, except for $24,000 received from other LLC's interested in the litigation's outcome. In support of its request for attorney fees, counsel contended that fees through trial would have totaled $214,287.50 if Northwest had been billed at the firm's standard billing rates, and that this lodestar should be adjusted upward due to the nature of the issues and the benefits obtained in the litigation.

The trial court awarded Northwest its attorney fees under both Code of Civil Procedure section 1021.5 and the common fund doctrine. The court found reasonable the hourly rates charged by Northwest's attorneys and legal assistant ($350 and $100, respectively), as well as the expenditure of 631 hours through trial, and validated a corresponding lodestar amount of $214,287.50. The court adjusted the lodestar upward to $3.5 million in light of numerous circumstances, discussed *post.*

FTB challenges the attorney fee award on three grounds: (1) the court erred by awarding attorney fees under Code of Civil Procedure section 1021.5 and the common fund doctrine, because the only means by which Northwest could recover for its attorney fees resides in section 19717; (2) Northwest did not meet the requirements of Code of Civil Procedure section 1021.5 and the common fund doctrine; and (3) the court erred in adjusting the lodestar computation upward.

1. *Revenue and Taxation Code Section 19717*

Code of Civil Procedure section 1032, subdivision (b) provides that "[e]xcept as otherwise expressly provided by statute, a *prevailing party* is entitled as a matter of right to recover costs in any action or proceeding." (Italics added.) "Costs" include attorney fees provided by contract, statute, or law. (Code Civ. Proc., § 1033.5, subd. (a)(10).) Northwest pursued attorney fees as provided by statute (Code Civ. Proc., § 1021.5) and law (the common fund doctrine).

FTB contends, however, that section 19717 is the exclusive statute by which a party may recover for its attorney fees and costs in a tax refund

Cal.App.4th 1444, 1449–1450 [50 Cal.Rptr.3d 79] (*Macy's*).) This amounts to the entirety of the Levy collected in Northwest's case, because none of its total income derived from California sources.

action. Section 19717, subdivision (a) states: "The *prevailing party* may be awarded a judgment for reasonable litigation costs incurred, in the case of any civil proceeding brought by or against the State of California in a court of record of this state in connection with the determination, collection, or *refund of any tax*, interest, or penalty *under this part*." (Italics added.) Northwest's complaint sought a refund under section 19382, which is in the same statutory part (pt. 10.2 of div. 2 of the Rev. & Tax. Code) as section 19717.

■ It may matter a great deal whether section 19717 is the exclusive means of recovering attorney fees, because a "prevailing party" under section 19717 is different from a "prevailing party" under Code of Civil Procedure section 1032, subdivision (b). There is no dispute that, under the latter statute, a prevailing party includes one who obtains a net monetary recovery in the litigation, and Northwest meets this definition. (See Code Civ. Proc., § 1032, subd. (a)(4).) Under section 19717, by contrast, "[a] party shall *not* be treated as the prevailing party . . . if the State of California establishes that its position in the proceeding was substantially justified." (§ 19717, subd. (c)(2)(B)(i), italics added.) The term " '[s]ubstantially justified' is construed to mean 'not necessarily a prevailing position' but one which is 'justified to a degree that would satisfy a reasonable person' or . . . has a ' "reasonable basis both in law and in fact." ' [Citations.]" (*Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1188–1189 [59 Cal.Rptr.2d 602].) Indeed, where "reasonable minds could . . . differ . . . ," the FTB's position has been deemed to be substantially justified. (*Id.* at p. 1189; see also *Tetra Pak, Inc. v. State Bd. of Equalization* (1991) 234 Cal.App.3d 1751, 1763 [286 Cal.Rptr. 529] ["substantial justification" equated to good faith dispute or nonfrivolous claim].) FTB contends that Northwest is not a prevailing party under section 19717, because FTB's position in the case was substantially justified.

■ The purported exclusivity of section 19717 could also be significant because it provides a different basis for determining the entitlement and amount of fees than do Code of Civil Procedure section 1021.5 and the common fund doctrine. Under section 19717, the "[r]easonable litigation costs" recoverable under subdivision (a) includes attorney fees at market rates, potentially subject to a statutory cap on the hourly rate. (§ 19717, subd. (c)(1)(B)(iii).)[17] Code of Civil Procedure section 1021.5, however, permits an award of attorney fees that are reasonable without regard to a

---

[17] The relevant provisions state: "(B) Based upon prevailing market rates for the kind or quality of services furnished, any of the following: [¶] . . . [¶] (iii) Reasonable fees paid or incurred for the services of attorneys in connection with the civil proceeding, except that those fees shall not be in excess of one hundred twenty-five dollars ($125) per hour unless the court determines that a special factor, such as the limited availability of qualified attorneys for the proceeding, the difficulty of the issues presented in the case, or the local availability of tax

statutory cap, but only if the successful party enforced "an important right affecting the public interest," conferring a "significant benefit . . . on the general public or a large class of persons." (Code Civ. Proc., §1021.5.) Under the common fund doctrine, reasonable attorney fees may be awarded where the litigation created a fund from which, in equity, the successful plaintiff's attorney should be paid.

By its terms, section 19717 plainly applies to a tax refund case brought, as Northwest's was, under section 19382. FTB's argument that *only* section 19717 applies is more complicated, and actually begins with section 18401.

Section 18401 reads: "Each provision of this part [pt. 10.2 of div. 2] *shall* apply to Part 10 (commencing with Section 17001) [the Personal Income Tax Law] . . . unless otherwise provided." (Italics added.) Section 19717 is a provision contained in part 10.2 of division 2. Therefore, section 18401 mandates that section 19717 "shall apply" to part 10, which includes section 17942 (authorizing the Levy). In addition, subdivision (c) of former section 17942 provided that the "fee assessed under this section . . . shall be collected and refunded in the same manner as the taxes imposed by [part 10]." Thus, FTB urges, section 18401 makes section 19717 the exclusive authority for obtaining attorney fees awards in suits for refunds of LLC fees.

FTB further points out that section 19717 was enacted by the Legislature pursuant to its authority in article XIII, section 32 of the California Constitution, which provides that refund actions must be brought in the manner mandated by the Legislature. (See *Woosley, supra*, 3 Cal.4th at p. 792 [Cal. Const., art. XIII, §32 precludes court from expanding methods for seeking refunds expressly provided by the Legislature].)[18] The California Constitution imposes exclusive legislative control over the manner in which tax refunds may be sought so that governmental entities may engage in fiscal planning based on expected tax revenues. (*Woosley, supra*, at p. 789.) In

---

expertise justifies a higher rate. In the case of each calendar year beginning with calendar year 2001, the Franchise Tax Board shall recompute the dollar amount referred to in the preceding sentence. That computation shall be made by increasing the amount in this clause by an amount equal to the cost-of-living adjustment determined under subdivision (h) of Section 17041. . . . [¶] (iv) The court may award reasonable attorney fees under subdivision (a) in excess of the attorney fees paid or incurred if the fees are less than the reasonable attorneys' fees because the attorney is representing the prevailing party for no fee or for a fee which (taking into account all the facts and circumstances) is no more than a nominal fee. This clause shall apply only if the award is paid to the attorney or the attorney's employer." (§ 19717, subd. (c)(1)(B)(iii).)

[18] Article XIII, section 32 of the California Constitution states: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, *in such manner* as may be provided by the Legislature." (Italics added.)

addition, FTB argues, section 19717 prevails because a specific statute prevails over a general statute on the same subject, especially where the specific statute was adopted after the more general statute. (Citing *Canteen Corp. v. State Bd. of Equalization* (1985) 174 Cal.App.3d 952, 960–961 [220 Cal.Rptr. 306]; see also *Miller v. Superior Court* (1999) 21 Cal.4th 883, 895–896 [89 Cal.Rptr.2d 834, 986 P.2d 170].)

Instructive on the exclusivity of section 19717 is *Agnew v. State Bd. of Equalization* (2005) 134 Cal.App.4th 899 [36 Cal.Rptr.3d 464] (*Agnew*). There, the SBE contended that section 7156 barred the application of Code of Civil Procedure section 1032 for an award of attorney fees and costs. (*Agnew, supra*, at pp. 911–912.) Section 7156, applicable to sales and use tax controversies, is akin to section 19717 in that it permits an award of costs such as attorney fees, subject to specified limitations, where the state's litigation position was not "substantially justified." (See § 7156, subd. (c)(2)(A)(i).) The court rejected the SBE's contention that section 7156 was the exclusive remedy, finding that *Woosley*, and other cases holding that refund actions must be brought in the manner prescribed by the Legislature, addressed procedures for filing and maintaining tax refund suits, not motions for costs. (*Agnew, supra*, at p. 912, fn. 21.) In addition, the *Agnew* court noted, although Code of Civil Procedure section 1032, subdivision (b) may be invoked "[e]xcept as otherwise *expressly* provided by statute," "Revenue and Taxation Code section 7156 contains no 'express' exception to the general rule permitting a taxpayer as a prevailing party to recover his costs under Code of Civil Procedure section 1032, subdivision (b)." (*Agnew, supra*, at p. 913, italics added.) The court in *Agnew* further observed that section 7156 and Code of Civil Procedure section 1032, subdivision (b) complement each other, containing different eligibility requirements and permitting different types of compensation. (*Agnew, supra*, at pp. 913–915; see *Murillo v. Fleetwood Enterprises, Inc.* (1998) 17 Cal.4th 985, 991 [73 Cal.Rptr.2d 682, 953 P.2d 858] [seller could recover attorney fees under Code Civ. Proc., § 1032, subd. (b), where Civ. Code, § 1794, subd. (d) provided that buyer could recover attorney fees but was silent as to seller].)

We conclude that section 19717 is not the only provision by which a party in a tax refund action may recover its attorney fees. As the *Agnew* court noted, *Woosley* is not on point, because it did not involve an attorney fee claim. Moreover, section 19717 contains no *express* prohibition against a taxpayer seeking attorney fees pursuant to Code of Civil Procedure section 1032, subdivision (b).

FTB argues that reliance on *Agnew* is misplaced because the language of section 18401 differs from the language of the corresponding provision in the statutory scheme at issue in *Agnew*. Specifically, the taxpayer in *Agnew*

sought recovery of litigation costs under section 7156, which is in the sales and use tax law, division 2, part 1, of the code. The sales and use tax law also includes section 7082, which provides: "*Unless the context indicates otherwise*, the provisions of this article shall apply to this part." (Italics added.) Unlike section 18401—which states unconditionally that section 19717 applies to actions brought under part 10 of the code—section 7082 provides discretion in sales tax litigation to resort to other statutes or laws for recovery of litigation costs if "the context indicates otherwise."

FTB's attempt to distinguish *Agnew* ignores the *Agnew* court's reasoning. The basis of the *Agnew* decision was not that there was an exception built into the language of section 7082, but that section 7156 did not include an express exception to Code of Civil Procedure section 1032, subdivision (b). Because the court in *Agnew* did not base its decision on section 7082, the difference between section 18401 and section 7082 provides no persuasive distinction between this case and *Agnew*.

Moreover, FTB overstates section 18401. Although section 18401 may dictate that section 19717 "shall apply" to former section 17942, it does not state that *only* section 19717 can apply to section 17942, or that any other provision "shall not apply" to section 17942. In short, section 19717 does not preclude application of Code of Civil Procedure section 1032 to Northwest's tax refund case.

FTB's related arguments—that section 19717 trumps Code of Civil Procedure section 1021.5—also fail. FTB contends that Code of Civil Procedure section 1021.5 does not apply where, as here, the plaintiff has alleged a violation of a statute that itself provides a mechanism for obtaining an attorney fee award. (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 637–638 [71 Cal.Rptr.2d 632] (*Flannery*) [since the California Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.) has attorney fee provisions, resort to Code Civ. Proc., § 1021.5 is unnecessary].) FTB reads *Flannery* too broadly. The referenced statement was dictum, as the court in *Flannery* concluded that Code of Civil Procedure section 1021.5 did not apply because there was insufficient evidence that the lawsuit conferred a significant benefit on the general public. (*Flannery, supra,* at p. 637.) Moreover, the court in *Flannery* recognized a distinct equitable purpose behind Code of Civil Procedure section 1021.5: "Underlying the private attorney general doctrine is the recognition that privately initiated lawsuits often are essential to effectuate fundamental public policies embodied in constitutional or statutory provisions, and that without some mechanism authorizing a fee award, such private actions often will as a practical matter be infeasible. The basic objective of the doctrine is to encourage suits enforcing important public policies by providing substantial attorney fees to

successful litigants in such cases. [Citation.]" (*Flannery, supra*, at p. 634.) FTB does not explain why this equitable concern might not also be appropriate in tax refund cases.

FTB further contends that the legal remedy of section 19717 precludes resort to Code of Civil Procedure section 1021.5, because the latter provides an equitable exception to the general rule that each party bears its own attorney fees. (See *Serrano v. Unruh* (1982) 32 Cal.3d 621, 632–635 [186 Cal.Rptr. 754, 652 P.2d 985]; Code Civ. Proc., § 1021.) In this regard, FTB refers us to *Katsivalis v. Serrano Reconveyance Co.* (1977) 70 Cal.App.3d 200, 213 [138 Cal.Rptr. 620] (*Katsivalis*). In *Katsivalis*, the court merely acknowledged a party's contention that the trial court had erred in imposing an equitable lien on certain property because the lender had an adequate remedy at law. *Katsivalis* did not hold that statutory authority for recovering attorney fees precludes an equitable award of attorney fees, and it is not on point. Furthermore, while the private attorney general doctrine underlying Code of Civil Procedure section 1021.5 originated as a judicial exercise of equitable powers in *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*), it has since been codified in Code of Civil Procedure section 1021.5.

Lastly, FTB presents an argument in its reply brief based on the legislative history of section 19717. According to FTB's analysis, section 19717 derived from former sections 19420 and 26491, which were enacted as part of a larger legislative package (Sen. Bill No. 813 (1983–1984 Reg. Sess.)) intended to reflect and conform to provisions of the Internal Revenue Code. In particular, FTB asserts, former sections 19420 and 26491 were conformed to Internal Revenue Code section 7430 (26 U.S.C. § 7430). As described by the federal Joint Committee on Taxation, Internal Revenue Code section 7430 was intended to be the "exclusive provision" for an award of litigation costs in any civil action to which it applied. Likewise, FTB argues, the California Legislature chose to make section 19717 the exclusive provision for an award of attorney fees in any civil or administrative matter to which section 19717 applies.

We disagree. The cited California legislative history nowhere mentions an intent to make section 19717 the exclusive means of recovering attorney fees in a tax refund action. Given the express mention of exclusivity in the legislative history of the federal statute, the California Legislature's silence on the issue is all the more significant. The logical inference is that the Legislature permitted recovery of attorney fees under section 19717 in order to provide an additional, rather than exclusive, means by which a litigant might recoup its attorney fees in a refund action.

Attorney fees are not recoverable under Code of Civil Procedure section 1032, subdivision (b) unless they are recoverable under some contract, statute or law (Code Civ. Proc., § 1033.5, subd. (a)(10)). Most tax refund cases are not brought pursuant to a contract, statute or law that would afford such relief; few would meet the standards of Code of Civil Procedure section 1021.5 or the common fund doctrine. Section 19717 therefore provides an alternative means of recovering attorney fees in the limited instance in which FTB's position is without substantial justification.

Section 19717 and Code of Civil Procedure sections 1032, 1033.5, and 1021.5 are thus readily harmonized. Code of Civil Procedure section 1032, subdivision (b), in conjunction with Code of Civil Procedure section 1033.5, provides a general right to attorney fees where another statute, contract, or law authorizes such an award. One such statute is section 19717, which requires the movant to prove it was a prevailing party within the meaning of section 19717 and limits the movant's recovery as set forth therein. Another such statute is Code of Civil Procedure section 1021.5, which does not compel the movant to prove the requirements of section 19717, but instead requires the movant to establish that it was a "successful party" in an action resulting in the "enforcement of an important right affecting the public interest," conferring a "significant benefit . . . on the general public or a large class of persons." (Code Civ. Proc., § 1021.5.) Thus, section 19717 and Code of Civil Procedure section 1021.5 (and the common fund doctrine) provide different remedies befitting different situations. (See *Agnew, supra*, 134 Cal.App.4th at pp. 913–915.)

Because we conclude that section 19717 is not the exclusive means or measure of attorney fees in a tax refund action, we turn to the basis of the trial court's award.

### 2. *Code of Civil Procedure Section 1021.5*

Code of Civil Procedure section 1021.5 provides: "a court may award attorneys' fees to a successful party . . . in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

Of these requirements, FTB contends only that the lawsuit did not result in a significant benefit to the general public or a large class of persons.[19] According to FTB, the trial court did not sustain a *facial* challenge to former section 17942 that would affect all LLC's registered in California, so the court's decision applies only to the commercial interests of one business entity, Northwest. This is not so clear, however. The trial court ruled: "Simply, because the Levy is unapportioned, it violates the Commerce and Due Process Clauses. As such, the Levy cannot constitutionally be applied to Plaintiff, and Plaintiff is entitled to a full refund [of] all of its payments pursuant to Rev. & Tax. Code § 17942 for the Years at Issue." From this it appears to us that the trial court *did* conclude that the statute was unconstitutional as to all LLC's and ruled that, as a result, the Levy was unconstitutional as to Northwest.

In any event, Code of Civil Procedure section 1021.5 requires that the action *result* in a significant benefit to the general public or a large class of persons. Thus, there need not be a significant benefit to many *plaintiffs*, but a significant benefit to many *persons*, whether plaintiffs or not. Therefore, even though the judgment applies only to Northwest, the precedent provides a basis by which many LLC's may seek refunds of taxes unconstitutionally levied on business outside of California.

After the trial court's decision, the FTB established a streamlined procedure for LLC's to file refund claims, and the Legislature passed Assembly Bill 1614, which would have applied apportionment and allocation rules (see § 25101 et seq.) to section 17942 retroactive to 2001 (were it not for the Governor's veto). In connection with Assembly Bill 1614, the Senate Revenue and Taxation Committee observed that if the trial court decision prevailed, the revenue loss would be *$1.4 billion* through fiscal year 2007–2008. The Treasurer's official statement, dated April 12, 2006, provided that "[a] final decision in favor of these plaintiffs applied to all taxpayers similarly situated could result in loss of annual revenue in excess of $250 million and potential refunds exceeding *$1 billion*." (Italics added.) Based on these estimates, the benefit of the trial court's decision to LLC's could arguably exceed $1 billion.[20]

---

[19] FTB suggests that Code of Civil Procedure section 1021.5 requires that a "readily ascertainable" large class of persons be significantly benefited by the court's decision. There is no statutory requirement that the class be "readily ascertainable." (Cf. *Serrano III, supra*, 20 Cal.3d at p. 40, fn. 10 [referring to ascertainable class with respect to substantial benefit doctrine, not private attorney general doctrine of Code Civ. Proc., § 1021.5].)

[20] The Treasurer's official statement referred to a final decision in favor of the plaintiffs in Northwest's case *and* another case, *Ventas Finance, supra*, No. 05-440001. Both of the estimates presume that the Levy for applicable years would be struck down in its entirety.

The FTB contends that the Treasurer's official statement is incorrect and the estimated benefit and the number of affected LLC's is much lower. A July 13, 2006 analysis of amended Assembly Bill 1614 estimated that the benefit would be closer to $150 million for LLC's with income from sources outside of California. (Analysis of Assem. Bill No. 1614 (2005–2006 Reg. Sess.) as amended June 22, 2006.) Specifically, FTB estimated that LLC's would pay 13 percent less if the apportionment method of Assembly Bill 1614 became law, and that of the $1.4 billion collected for the years not closed by the statute of limitations (2001–2006), 80 percent of the LLC's that potentially benefitted by the trial court's decision would file valid claims for refund. Thus, the FTB contends, the benefit would be $145.6 million ($1.4 billion x 80 percent x 13 percent), or approximately $150 million.[21]

Even if the projected refund for LLC's amounts to just $150 million, it still reflects a significant benefit for a large number of LLC's. Since the maximum amount of levy any LLC could pay in a given year is $11,790 (see former § 17942), and the maximum look-back period for any refund claim (barring unusual circumstances) is four years given the statute of limitations, the maximum amount of any single LLC's refund claim is $47,160. If every LLC were to claim this amount, it would take at least 3,000 LLC's to claim the $150 million in refunds. This matter is thus easily distinguishable from cases holding that a judgment provided only a private benefit. (See, e.g., *Flannery, supra,* 61 Cal.App.4th at pp. 635–636 [insufficient that lawsuit "sent a message" to government agencies that sexual discrimination and harassment in violation of FEHA would not be tolerated]; *Angelheart v. City of Burbank* (1991) 232 Cal.App.3d 460 [285 Cal.Rptr. 463] [no reasonable basis for concluding that lawsuit conferred benefit on large class of persons where there was no evidence of others similarly situated that would be affected by the changes in the law].)

---

[21] On October 10, 2007, the Governor signed Assembly Bill No. 198 (2007–2008 Reg. Sess.), amending former section 17942 for taxable years beginning on and after January 1, 2007, and adding section 19394. (Stats. 2007, ch. 381, § 3.) The amendment changed the language in former section 17942, subdivision (a), from "total income from all sources reportable to this state" to "total income from all sources *derived from or attributable to this state.*" (Italics added.) It also added the following language: " 'total income from all sources derived from or attributable to this state' shall be determined using the rules for assigning sales under Sections 25135 and 25136 and the regulations thereunder, as modified by regulations under Section 25137, other than those provisions that exclude receipts from the sales factor." (§ 17942, subd. (b)(1)(B).) FTB advises that, if the Levy as previously enacted is held to violate the Commerce Clause, an LLC that has filed a valid protective claim will only receive a refund of LLC fees that exceed the amount that would have been assessed pursuant to the statute as amended. (See also *Macy's, supra,* 143 Cal.App.4th at pp. 1449–1450.)

The trial court did not err in concluding that the litigation resulted in a significant benefit to a large class of persons. FTB fails to establish that the requirements for an award of attorney fees under Code of Civil Procedure 1021.5 were not met.

### 3. *Common Fund Doctrine*

■ The common fund doctrine is based on the principle that "where a common fund exists to which a number of persons are entitled and in their interest successful litigation is maintained for its preservation and protection, an allowance of counsel fees may properly be made from such fund." (*Winslow v. Harold G. Ferguson Corp.* (1944) 25 Cal.2d 274, 277 [153 P.2d 714].) The purpose of the doctrine is to allow a party, who has paid for counsel to prosecute a lawsuit that creates a fund from which others will benefit, to require those other beneficiaries to bear their fair share of the litigation costs. (*Serrano III, supra*, 20 Cal.3d at p. 35.) In other words, the common fund doctrine permits the plaintiffs' attorneys to recoup their fees from the fund.

The common fund doctrine plainly does not apply here. In the first place, the litigation did not result in the creation or preservation of a fund from which attorney fees could be paid. (See *Serrano III, supra*, 20 Cal.3d at pp. 37–38 ["[W]here plaintiffs' efforts have not effected the creation or preservation of an identifiable 'fund' of money out of which they seek to recover their attorneys fees, the 'common fund' exception is inapplicable."].)

Here, to the extent FTB received Levy payments from LLC's, they were deposited into the state's general fund. No separate fund was created. Although after the trial court's decision in this case the FTB announced contingent and protective administrative claims procedures, still no fund was created. In any event, to constitute a common fund within the meaning of the doctrine, the fund must be created or preserved by the litigation, not created in response to it. (*Serrano III, supra*, 20 Cal.3d at p. 36; *Jordan v. Department of Motor Vehicles* (2002) 100 Cal.App.4th 431, 446–447 [123 Cal.Rptr.2d 122] (*Jordan*).

Northwest argues that *Serrano III* and *Jordan* are inapposite, in that the fund or potential fund in those cases were held insufficient because they derived from legislative action, while here no legislative action will be required. (*Serrano III, supra*, 20 Cal.3d at p. 36 [no fund created because any additional expenditure of educational funds as a result of decision holding public school financing system violative of equal protection was not a requirement of the judgment but a legislative response]; *Jordan, supra*, 100 Cal.App.4th at p. 447 [no common fund because refunds of contested smog

fee was not mandated by judgment but the result of remedial action independently taken by the Governor and Legislature].) Northwest misperceives the rulings in *Serrano III* and *Jordan*, however, and we are not convinced that either *Serrano III* or *Jordan* may be distinguished from the matter at hand.

Moreover, even if the "fund" from which LLC's would obtain a refund constituted a common fund within the meaning of *Serrano III*, the common fund doctrine would not apply because Northwest is not seeking to recover its attorney fees from the *"fund,"* but from the FTB—in effect, California taxpayers. (*Serrano III, supra,* 20 Cal.3d at pp. 37–38 [common fund doctrine does not apply where fees would not be paid out of the purported fund]; *Jordan, supra,* 100 Cal.App.4th at p. 446 [application of the common fund does not conform to its equitable underpinnings where the attorney fees would not be paid out of the recovery and borne by all who benefitted].) The trial court erred in concluding that attorney fees could be awarded under the common fund doctrine.

### 4. *Upward Adjustment of Lodestar*

Lastly, we reach the issue of whether the trial court erred in adjusting the lodestar amount of Northwest's attorney fees upward, to a total award of $3.5 million. We review the trial court's calculation of the attorney fee award for an abuse of discretion. (*Serrano III, supra,* 20 Cal.3d at p. 49; *Lealao v. Beneficial California, Inc.* (2000) 82 Cal.App.4th 19, 40–41 [97 Cal.Rptr.2d 797] (*Lealao*).) We nonetheless remain mindful that, in exercising its discretion, the trial court must not intertwine considerations relevant to the determination of the lodestar amount with factors relevant to whether the lodestar should be adjusted upward. (*Flannery, supra,* 61 Cal.App.4th at p. 647; *Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 625 [98 Cal.Rptr.2d 388] (*Ramos*).) It is also imperative that the trial court provide a sufficient explanation for its upward adjustment of the lodestar. (*Ramos, supra,* at pp. 624, 629.)

██ The lodestar method begins by multiplying the number of hours spent by the attorneys by an hourly rate that is reasonable under the circumstances. (*Serrano III, supra,* 20 Cal.3d at p. 48.) The court may then adjust the lodestar upward or downward, depending on the circumstances of the litigation and counsel's representation, such as the following: the novelty and difficulty of the questions involved and the skill displayed in presenting them; the extent to which the nature of the litigation precluded other employment by the attorneys; the contingent nature of the fee award; whether the award would be against the state and ultimately fall upon the taxpayers; whether the attorneys received public and charitable funding for the purpose of bringing lawsuits of the same character; and whether monies awarded

would inure not to the individual benefit of the attorneys involved but to the organizations by which they are employed. (*Serrano III, supra,* 20 Cal.3d at p. 49.) This is an illustrative rather than exclusive list of potentially relevant factors. (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 834 [112 Cal.Rptr.2d 284].)

In the matter before us, the trial court identified several factors to justify its upward adjustment of the lodestar: "the expertise of [Northwest's] attorneys, novelty and difficulty of the questions involved, the skill displayed in presenting this case, the contingent nature of the fee award, the importance of the constitutional rights preserved through this action, the results achieved, and the substantial benefits conferred on the public through this action . . . ." Without further elaboration, the court concluded: "Accordingly, this Court awards attorneys' fees in the amount of $3.5 million."

Based on the record, and in the absence of any further explanation by the trial court, the listing of these factors does not provide a persuasive justification for adjusting the lodestar upward. The expertise of Northwest's attorneys, and to some extent the skill they displayed in presenting the case, is already included in calculating the lodestar and should have no or little significance in determining whether the lodestar should be enhanced. (*Flannery, supra,* 61 Cal.App.4th at p. 644 [factors upon which court explicitly relied in calculating the lodestar, such as the skill and experience of the attorneys and the nature of the work performed, cannot be used again to enhance or apply a multiplier to the attorney fee award].) Without explication by the trial court, the novelty or difficulty of the questions involved in this matter do not appear to be particularly great: Commerce Clause principles, including the *Complete Auto* test on which counsel primarily relied, have been part of the law for decades. While the contingent nature of the fee agreement is a factor that may be considered, it is not dispositive. The remaining items cited by the trial court—the importance of the constitutional rights preserved through the action, the results achieved, and the substantial benefits conferred on the public through this action—are considered in determining whether Code of Civil Procedure section 1021.5 applies in the first instance. (*Flannery, supra,* at p. 647 [fact that litigation conferred a significant benefit on a large class of persons does "not provide any basis for calculating the amount of an award, let alone for enhancing or applying a multiplier to the lodestar"]; *Ramos, supra,* 82 Cal.App.4th 615 [2.5 multiplier was not a proper exercise of discretion if dependent on duplicative reweighing of factors such as the skilled nature of the representation and public interest benefits].) To the extent Northwest contends that an exceptional effort on the part of counsel resulted in an exceptional benefit (*Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 582 [21 Cal.Rptr.3d 331,

101 P.3d 140]), the trial court did not adequately set forth any basis for such a conclusion. (See *Thayer v. Wells Fargo Bank, supra,* 92 Cal.App.4th at pp. 838–839.)[22]

Moreover, other factors suggest that an upward adjustment of the lodestar is inappropriate. One such factor, recognized by our Supreme Court, is the *source* from which an attorney fee award would be paid. (*Serrano III, supra,* 20 Cal.3d at p. 49.) Here, the attorney fees award would not be paid out of a common fund or be borne by a private wrongdoer, but would ultimately fall upon the shoulders of California taxpayers. Another such factor is whether "the monies awarded would inure not to the individual benefit of the attorneys involved but the organizations by which they are employed." (*Serrano III, supra,* at p. 49.) The attorney fees in this case would go not to Northwest or to other LLC's, but to Northwest's private attorneys. Both of these circumstances militate against an upward adjustment of the lodestar.

Contrary to Northwest's arguments, the $3.5 million attorney fee award may not be upheld by comparing it to the $1 billion (or $150 million) in benefits attained by LLC's through counsel's efforts. Conceding that a court may not indulge in a mere percentage-of-the benefit computation to determine a fee award, Northwest urges that the lodestar may be cross-checked against the value of the benefits delivered by counsel, by considering the amount counsel reasonably might have negotiated in the marketplace with those who benefited from its conduct. (See *Lealao, supra,* 82 Cal.App.4th at pp. 45, 49.) Given a $1 billion estimate of refunds to LLC's in the aggregate, Northwest asserts, the $3.5 million in attorney fees represents less than one-half of one percent of the benefit delivered by counsel.

Northwest's argument is not persuasive. In the first place, this is not the only case on the subject of the Levy (former § 17942). *Ventas Finance* is now pending before this appellate district (*Ventas Finance I, LLC v. Franchise Tax Bd.,* Nos. A116277, A117751, consolidated). There, the plaintiff is a foreign LLC that registered in California and earned its income from both within and outside of California. *Bakersfield Mall, LLC v. Franchise Tax Board,* pending in San Francisco Superior Court (No. 07-462728), is a putative class action in which the purported class is comprised of LLC's earning their income solely from California sources. (<http://www.ftb.ca.gov/aboutFTB/psb/results.asp?bulletinTitle=Public+Service+Bulletin+2007-07-13> [as of Jan. 31, 2008].) As acknowledged at oral argument, the LLC plaintiffs in those cases are represented by the attorneys for Northwest in this case. Northwest has not explained how the attorney fee award in this case may be justified by the benefit that was purportedly provided to *all* LLC's, when the

---

[22] Contrary to Northwest's representation, *Serrano III* did not state that the attorneys' expertise (distinguished from their skill in presenting the case) was a factor favoring upward adjustment of the lodestar. (*Serrano III, supra,* 20 Cal.3d at p. 49.)

claims of certain categories of LLC's are being addressed in other litigation. In any event, there is no indication from the written order that the trial court considered the fact of this other litigation in determining whether the lodestar should be enhanced.

Furthermore, *Lealao* is not as helpful to Northwest as it asserts. The court in *Lealao* stated its holding as follows: "Accordingly, we hold that, in cases in which the value of the *class* recovery can be monetized with a reasonable degree of certainty and it is *not otherwise inappropriate*, a trial court has discretion to adjust the basic lodestar through the application of a positive or negative multiplier *where necessary to ensure that the fee awarded is within the range of fees freely negotiated in the legal marketplace in comparable litigation*." (*Lealao, supra*, 82 Cal.App.4th at pp. 49–50, italics added.) Thus, the cross-check procedure and *Lealao* itself were in the context of class and representative actions, not individual suits such as the matter before us.

Moreover, by no means did *Lealao* suggest that the cross-check procedure could be employed to reach an unreasonable result. While it may not be error for a court to consider the extent to which nonparty LLC's might benefit monetarily from the decision, the court's order does not explain why the ultimate fee award of $3.5 million bears a reasonable relationship to the $219,566.95 lodestar figure or to the purpose of the private attorney general doctrine, as it amounts to 16 times the amount of reasonable fees in this case and reflects a billing rate of approximately $5,546 per hour. This appears far beyond what might be "necessary to ensure that the fee awarded is within the range of fees freely negotiated in the legal marketplace in comparable litigation." (*Lealao, supra*, 82 Cal.App.4th at pp. 49–50; see *Ramos, supra*, 82 Cal.App.4th at p. 626 [given that a "well-established public policy in this area is to increase the predictability and to reduce the randomness of attorney fees awards in fee shifting cases," a reasonable exercise of discretion would not permit counsel to be paid "around $800 per hour" except in "truly pioneering and high risk cases"].) Without sufficient justification in the record—which we do not find here—the award cannot be upheld. (See *Press v. Lucky Stores, Inc.* (1983) 34 Cal.3d 311, 324 [193 Cal.Rptr. 900, 667 P.2d 704]; *Ramos, supra*, at p. 629.)

In sum, given the absence of explanation in the trial court's order, the record before us does not provide adequate support for the court's upward adjustment of the lodestar. The attorney fee award must be reversed and the matter remanded for further consideration. If the trial court on remand chooses to enhance the lodestar amount, it must "more precisely articulate why such increment is appropriate." (*Ramos, supra*, 82 Cal.App.4th at p. 629.)[23]

---

[23] Northwest also requests an award of fees in this appeal. Northwest is entitled to attorney fees in appeal No. A114805, in which it successfully defended the judgment on the merits.

## III. DISPOSITION

The judgment is affirmed with the exception that the order awarding attorney fees and costs is reversed. The matter is remanded to the trial court to determine anew the appropriate amount of fees and costs to be awarded consistent with this opinion. Respondent shall recover its costs and attorney fees on appeal in appeal No. A114805. Appellant shall recover its costs on appeal in appeal Nos. A115841 and A115950.

Jones, P. J., and Stevens, J.,* concurred.

A petition for a rehearing was denied March 3, 2008, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied June 11, 2008, S161627.

---

The trial court shall award such fees, in an amount in its discretion, upon remand. Northwest is not entitled to attorney fees in appeal Nos. A115841 and A115950, in light of our reversal of the attorney fees order.

*Retired Associate Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.